UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

ALAJANDRO ORTIZ,

    Plaintiff,

v.              06-CV-3067

ROGER WALKER et al.,

    Defendants.

## Order

Before the court are the defendants' motions for summary judgment. The court concludes that no inference of deliberate indifference arises from the record. Accordingly, summary judgment is mandated for the defendants.

## Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). This showing can be made by "pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. The burden shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Outlaw*, 259 F.3d at 837. In other words, the non-moving party must show that there is enough evidence for a rational juror to find in his or her favor. In determining whether factual issues exist, the court must view all the evidence in the light most favorable to the non-moving party and resolves any material factual disputes in the non-movant's favor. *Beraha v. Baxter Health Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992).

## Undisputed Facts

Many of the facts below are adopted verbatim from the defendants' motions for summary judgment, to the extent supported by cites to the record and not disputed by Plaintiff.

    1. Plaintiff has been incarcerated at Big Muddy since February 18, 2004.

    2. Defendant Isaacs is the Health Care Unit Administrator at Big Muddy and has held this position since May 1, 2004.

3. Defendant Elyea was employed as the Medical Director for the Department from August 1, 1999, until April 30, 2007.

4. Defendant Dr. Sheperd and Dr. Santos are licensed physicians. They were two of the doctors providing medical treatment to inmates at Big Muddy.

5. Defendants Nurse Cochrane and Nurse Fred are licensed practical nurses.

6. Defendant Cookston is an x-ray technician and a licensed physical therapist aide.

7. Defendants Cochrane, Cookston and Fred were three health care professionals who provided care and treatment to inmates housed at Big Muddy.

8. On September 3, 2005, Plaintiff injured his left knee playing soccer in the prison yard at Big Muddy. He was taken to Big Muddy's Medical Services Unit, where a nurse assessed his knee. The nurse contacted Dr. Santos who ordered Tylenol, cold applications and elevation of the plaintiff's knee. Dr. Santos also admitted the plaintiff to the prison's infirmary to ensure that the plaintiff did not reinjure his knee before Dr. Santos could personally examine him the next day.

9. The day after the injury, September 4, 2005, Dr. Santos examined Plaintiff's knee. Dr. Santos noted that the knee was bruised and exhibited some tenderness. No bleeding or deformity was noted. Dr. Santos performed range of motion tests and noted a decreased range of motion. Dr. Santos diagnosed a sprained knee. His treatment plan included a warm compress three times per day, Advil three times per day, crutches and follow up in one week. Dr. Santos did not order a low bunk, low gallery permit at this time.

10. It appears that Plaintiff was issued only one crutch on September 4, 2005. (Plaintiff's grievance, Ex. B to Plaintiff's Response, d/e 78; Plaintiff's Dep. Pp. 13-15). He was sent back to the health care unit on September 5, 2005, where he received a second crutch. (Defs.' Ex. A; Isaacs Aff., ¶ 8.). The crutch issued on September 5, 2005, was defective, lacking a rubber tip. (Plaintiff's grievance, Ex. B to Plaintiff's Response, d/e 78; Plaintiff's Dep. Pp. 13-15).

11. Defendants assert that it a Nurse Beaty (who is not a defendant) who provided the plaintiff crutches and education on using them. Plaintiff disputes this, asserting that Defendant Cochrane provided the crutches. The court accepts Plaintiff's version for purposes of this order.

12. Plaintiff asserts that the defendants knew the crutch was defective because another inmate had told Plaintiff that the same defective crutch had been taken from him because of its defect. This is hearsay. Plaintiff does not seem to assert that he told anyone about the missing tip. However, an inference of knowledge arguably arises from the fact that the rubber tip was missing–something that might arguably be noticed by anyone issuing the crutches or observing Plaintiff using them. Additionally, no expert is needed to infer that the rubber tip on a crutch

provides traction, and consequently that a crutch with no rubber tip on the bottom could slip more easily.

      13. On September 6, 2005, Plaintiff was going down the stairs with his crutches and he fell because the defective crutch slipped. Plaintiff fell on his left knee, left wrist and back. He was taken to the HCU where a nurse assessed him. Dr. Fatoki admitted Plaintiff to the infirmary and a nurse elevated the plaintiff's left knee with pillows.

      14. On September 7, 2005, Dr. Fatoki sent Plaintiff out for an x-ray of his left knee. The x-ray result showed: "no evidence of fracture, dislocation or other significant bone abnormality." After reviewing the results, Dr. Fatoki discharged the plaintiff from the infirmary, prescribed continued use Plaintiff's anti-inflammatory prescription and continued crutch use. Plaintiff asserts that he was almost issued the defective crutch again, but that an officer and inmate stepped in and placed a rubber tip on the bottom of the crutch. (Plaintiff's grievance). Dr. Fatoki did not order a low bunk, low gallery permit at this time.

      15. On September 14, 2005, Dr. Sheperd examined Plaintiff's knee. Dr. Sheperd performed various range of motion tests and diagnosed Plaintiff with derangement of the left knee. Dr. Sheperd prescribed continued use of crutches and indicated that he would consult with Dr. Fatoki about a possible orthopedic referral. Dr. Santos also provided the plaintiff with a low bunk-low gallery permit for two months, which was renewed through December 15, 2006.

      16. On September 22, 2005, Dr. Santos examined Plaintiff's left knee and back. Dr. Santos referred Plaintiff to an orthopedic specialist. Before being examined by an orthopedist, Plaintiff was sent out for an x-ray of his back, which found that Plaintiff had a "normal lumbar spine."

      17. On October 11, 2005, Plaintiff was sent on a medical furlough to Kenneth Hall Regional Hospital in East St. Louis, Illinois, at which time he was examined by Dr. Miller, an orthopedic surgeon, for Plaintiff's knee, wrist and back. Dr. Miller diagnosed Plaintiff with a sprained wrist, contusion of the paraspinal muscles, and a meniscal tear of his knee with possible partial ACL sprain. Dr. Miller recommended that staff continue to monitor the wrist and back contusion. He also recommended an MRI of the left knee.

      18. Dr. Sheperd examined the plaintiff's left knee on October 17, 2005, and referred him for an MRI. Dr. Sheperd also refilled Plaintiff's anti-inflammatory prescription and ordered that the plaintiff's physical therapy continue.

      19. On October 26, 2005, Dr. Sheperd again examined the plaintiff's left knee and prescribed two ACE wrap bandages to stabilize the knee.

      20. On November 4, 2005, an MRI was taken of Plaintiff's knee. The MRI revealed a "partial tear or sprain of the ACL. Joint effusion or hemarthrosis. Degenerative changes including meniscal changed."

21. On November 29, 2005, another orthopedic specialist, Dr. Pullisetty, evaluated Plaintiff and reviewed the MRI. Dr. Pulisetty's recommendation was to observe Plaintiff's knee for another month and return for a follow-up exam. The record does not explain why Dr. Pullisetty, rather than Dr. Miller, evaluated the MRI.

22. On December 18, 2005, Plaintiff was admitted to the infirmary for complaints of pain and swelling to his left knee. (Defs.' Ex. A; Isaacs Aff., ¶ 18.) Plaintiff was again instructed on how to use crutches and was discharged from the infirmary on December 19, 2005. (Defs.' Ex. A; Isaacs Aff., ¶ 18.)

23. On December 19, 2005, Dr. Sheperd examined Plaintiff's knee and arranged a follow up visit with Dr. Pulisetty.

24. On or about January 18, 2006, Dr. Pulisetty examined Plaintiff and found no swelling and good range of motion. Dr. Pulisetty noted in his report that arthroscopic surgery might not be needed, but he recommended a second opinion in light of Plaintiff's MRI. Dr. Pulisetty recommended referral to Dr. Ramon for a second opinion in favor or against arthroscopy.

25. On February 23, 2006, Dr. Santos sent Plaintiff to see Dr. Michael Davis, an orthopedic surgeon. Dr. Davis injected Plaintiff's knew with a steroidal anti-inflammatory. Dr. Davis noted in his report that Plaintiff reported 50% symptomatic improvement, though Plaintiff testified in his deposition that the shot had not helped at all (Plaintiff's Dep. p. 36). Dr. Davis recommended physical therapy three times a week and a follow up to determine Plaintiff's response to injection. Dr. Davis noted that surgery might be considered if Plaintiff did not respond well to the conservative treatment.

26. On March 25, 2006, Plaintiff was examined by a designated physician, who ordered an elevator permit for a period of six months. (Defs.' Ex. A; Isaacs Aff., ¶ 22.) On that same date, Defendant Isaacs sent a memorandum to the Big Muddy Assignment Office indicating that Plaintiff's designated physician ordered an elevator permit. (Defs.' Ex. A; Isaacs Aff., ¶ 22.)

27. Plaintiff continued to have knee pain. Dr. Sheperd sent Plaintiff to see Dr. Ramon, another orthopedic specialist, on March 26, 2006. It is not clear whether Plaintiff returned to see Dr. Davis. Dr. Ramon recommended exploratory arthroscopy.

28. On April 10, 2006, Plaintiff received exploratory arthroscopy by Dr. Ramon. Dr. Ramon's surgical report noted some scar tissue but no "complete" tear of the ACL. Dr. Ramon concluded that Plaintiff had a sprain but no significant instability. Dr. Ramon also noted there was no fluid inside the knee. Dr. Ramon recommended physical therapy, which Plaintiff received at Big Muddy.

29. After the surgery, Plaintiff was returned to Big Muddy. Dr. Sheperd prescribed Tylenol, bed rest, elevation of the leg, crutches and two days observation in the infirmary. After

two days in the infirmary, Dr. Sheperd discharged Plaintiff from the infirmary.

30. On April 19, 2006, Plaintiff saw Dr. Ramon for follow-up. Dr. Ramon explained the results of the exploratory surgery and recommended progressive physical therapy with follow up in four weeks.

31. On June 15, 2006, Plaintiff was examined for complaints of pain and swelling to his left knee. Plaintiff's designated physician ordered a low bunk permit.

32. On July 6, 2006, Plaintiff had an x-ray taken of his left knee. Results of the x-ray showed no fracture or subluxations or radiopaque foreign bodies, some mild medial space narrowing, and no significant bony spurring.

33. On July 11, 2006, Plaintiff was sent on a medical furlough, at which time he was examined by an orthopedic surgeon.

34. On July 28, 2006, Plaintiff was sent on a medical furlough to Kenneth Hall Regional Hospital, at which time an MRI was taken of his left knee.

35. At his deposition in May 2007, Plaintiff stated (through an interpreter) that he can walk but not without "a little" pain (Plaintiff's Dep. p. 53); that he can lift weights but that he cannot run; that his knee is still swollen; and that he can do leg extensions with 10-15 pounds of weight with help, but he used be able to do much more (Plaintiff's Dep. P. 43-44)(later he testified to 15-20 pounds)(Plaintiff's Dep. p. 55). He further stated that the medical staff had decided that the problem was in his head and that "[t]hey don't want to see me for the rest of my life." (Plaintiff's Dep. P. 52).

**Analysis**

Plaintiff maintains that Defendant Isaacs was responsible for maintaining the medical equipment and that she should have known that the one of the crutches issued to Plaintiff was defective because it lacked a rubber tip. He argues that Isaacs and Cochrane should have known that the defective crutch endangered his safety when it was issued to him. The defective crutch slipped and caused him to fall down the stairs, aggravating his existing knee injury, spraining his wrist and causing a contusion on his back muscles.

The Eighth Amendment prohibits cruel and unusual punishment. In the context of the crutches claim, that means that: 1) a substantial risk of serious harm existed to Plaintiff; and 2) a defendant actually knows of the risk and disregards it. *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "'An official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.'" *Langston v. Peters*, 100 F.3d 1235, 1237 (7th Cir. 1996), *quoting Farmer v. Brennan*, 511 U.S. at 825. "Deliberate indifference is a subjective standard. To demonstrate deliberate indifference, [a plaintiff] must show that the defendants

'acted with a sufficiently culpable state of mind.'" *Johnson v. Snyder*, 444 F.3d 579, 585 (7th Cir. 2006)(Citations omitted).

The court is not sure that a crutch without a rubber tip presents a substantial risk of serious harm to the person using it, under Eighth Amendment standards. But in any event, there is no evidence that any of the defendants were deliberately indifferent to that risk. One may reasonably conclude that the defective crutch should not have been issued to Plaintiff and that his use of it proximately caused his fall down the stairs. This is a claim for negligence, not deliberate indifference. Deliberate indifference is more than negligence or gross negligence–it "'approaches intentional wrongdoing,'"'essentially a criminal recklessness standard, that is, ignoring a known risk.'" *Id.*. "Negligence on the part of an official does not violate the Constitution, and it is not enough that he or she should have known of a risk." *Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004)*, citing Haley v. Gross*, 86 F.3d 630, 641 (7th Cir.1996); *see also Mayoral v. Sheahan*, 245 F.3d 934, 938 (7th Cir. 2001)("A plaintiff cannot establish a violation of the Eighth or Fourteenth Amendment by a showing that officials were negligent . . .").

Plaintiff also asserts that the failure to issue him a low bunk and low gallery permit until 11 days after his injury and an elevator permit until six months after his injury, amounted to deliberate indifference because it caused him to experience unnecessary pain, discomfort and difficulty in trying to move about and go up and down stairs, and ultimately led to his injury from the fall on the stairs. As discussed above, though, there is simply no evidence allowing an inference of deliberate indifference. At most, these permits should have been issued sooner because it would have made life easier for Plaintiff. That just does not rise to the level of a constitutional claim on the facts of this record.

As to the medical treatment he received, Plaintiff argues that deliberate indifference can be inferred from the alleged delay in treatment. The facts do not support the conclusion of any unreasonable delay in medical treatment. Plaintiff was referred to an orthopedic specialist less than three weeks after his initial injury. He was taken to the specialist a little more than two weeks after that referral. The specialist's recommendation for an MRI was initiated less than a week later with a referral, and the MRI performed within one month of the specialist's recommendation. The evaluation by an outside specialist of the MRI occurred about 3 ½ weeks later. Plaintiff's follow-up appointment occurred about seven weeks later, rather than four weeks, but four weeks would have been December 29, 2008. At the follow-up, Dr. Pulisetty indicated he wasn't sure if arthroscopic surgery was necessary, since Plaintiff's range of motion was good and no swelling was noted, but Dr. Pulisetty referred for a second opinion in light of the MRI. About five weeks later, Plaintiff received that second opinion from Dr. Davis, who tried a steroid injection and physical therapy. That did not help, and a month later Dr. Ramon, noting no improvement, recommended exploratory arthroscopy. Plaintiff received that exploratory surgery. The court simply sees no "delay" in medical treatment, intentional or otherwise. Further, even if there were delays, there is no evidence that they caused any injury to Plaintiff.

6

Nor is there any deliberate indifference on the part of the doctors and specialists. It is clear from Plaintiff's deposition that he believes the prison doctors and the specialists did not do their job right because his knee is not fixed. (Plaintiff's Dep. "...obviously he (Dr. Pulisetty) could not find the problem because right now it's still not right.")(Plaintiff's Dep. p. 4 (Plaintiff did not agree with Dr. Ramon's findings that corrective surgery was not needed because Plaintiff's knee is "still bad."); (Plaintiff's Dep. p. 54, "I just want my knee back the way it was."). The court does not doubt that Plaintiff's knee is not the same as it was before he injured it playing soccer. A layperson can understand that based on his or her own experiences. A layperson also understands that doctors cannot always fix things back to the way they were before an injury. Here, Plaintiff was seen by three outside orthopedic specialists and received numerous diagnostic tests, including an MRI and exploratory surgery. All of the specialists' recommendations were followed, and none of those recommendations evidence any lack of professionalism. The court understands Plaintiff's frustrations about his knee, but he has no Eighth Amendment claim regarding it.

The court would like to expand on its reasons for denying appointment of counsel, in light of *Pruitt v. Mote*, 503 F.3d 647 (7th Cir. 2007), which came down after the court's order denying Plaintiff's motion for reconsideration of counsel. (d/e's 9, 45). It appears Plaintiff made reasonable attempts to find counsel, so the guiding inquiry is "given the difficulty of the case, does the plaintiff appear competent to litigate it himself?" *Pruitt v. Mote*, 503 F.3d 647, 654-55 (7th Cir. 2007), *citing Farmer v. Haas*, 990 F.2d 319, 322 (7th Cir.1993).

> The inquiries are necessarily intertwined; the difficulty of the case is considered against the plaintiff's litigation capabilities, and those capabilities are examined in light of the challenges specific to the case at hand. The question is not whether a lawyer would present the case more effectively than the pro se plaintiff; "if that were the test, 'district judges would be required to request counsel for every indigent litigant.' "

*Pruitt*, 503 F.3d at 655 (quoted and other cites omitted).

Plaintiff's motion for appointment of counsel represented that Plaintiff could not understand or communicate in English well and that he had no legal knowledge. (d/e 9). At a status conference on September 19, 2006, the court attempted to question Plaintiff about his English skills. The court concluded:

> The plaintiff did not respond to the court's questioning in an understandable manner, except to indicate that he went to school in Mexico. He has filed motions indicating that his English language abilities are minimal. He asks in those motions to file pleadings in Spanish, receive communications translated in Spanish, and have a translator at court hearings. (d/e's 9, 39).
>
> On the court's questioning, a correctional officer at Big Muddy stated that the plaintiff was able to speak and understand English and was regularly observed

doing so. At this point it is unclear if the plaintiff's description of his language difficulties is true. In any event, there is not enough information in the record to determine if an appointed attorney would make a difference in the outcome of the case. See *Zarnes v. Rhodes*, 64 F.3d 285, 288 (7th Cir. 1995).[1] Accordingly, the plaintiff's motion for reconsideration of appointed counsel and motion for assistance will be denied, with leave to renew on a more developed record.

The court believed then, as it still does, that Plaintiff was and is competent to litigate this case *pro se*, at least up to the point of a trial. Plaintiff's submissions show an understanding of his claims and the law. The court does not doubt that other inmates with more knowledge drafted his pleadings (as is the case in many *pro se* prisoner claims), but that does not automatically mean that Plaintiff lacks the competence to proceed *pro se*. The bottom line is that Plaintiff (with or without help) was able to effectively communicate the factual grounds for his claim to this court, as well as submitting documentary evidence that he believed supported his claim. Plaintiff was able to obtain copies of his grievances and official responses, copies of his medical records, and to give his own testimony as evidence to support his case. This evidence would have been enough to at least hint of an inference of deliberate indifference if any existed.

Further, the court believes Plaintiff overstated to the court his inability to understand English. Plaintiff testified in his deposition that he had taken English as a second language for about seven months in 2004 (Plaintiff's Dep. pp. 60-61). He also testified that he scored in the Seventh grade, five months (7.5) on the English version of the TABE[2] test administered by prison officials, and "11 and up" on the Spanish version. (Plaintiff's Dep. p. 61). Yet Plaintiff behaved as though he did not understand a word the court said at the hearing on September 19, 2006, even in the face of testimony from an officer that Plaintiff was observed regularly speaking English (testimony the court found credible). Whether Plaintiff would have had sufficient English skills to conduct a trial *pro se* is a different question which would have required additional hearings and findings. That question, however, was mooted by the lack of any evidence to support Plaintiff's constitutional claims.

IT IS THEREFORE ORDERED:

1) The defendants' motions for summary judgment are granted (d/e 66, 70). The clerk of the court is directed to enter judgment in favor of the defendants and against the plaintiff. All pending motions are denied as moot, and this case is terminated, with the parties to bear their own costs.

---

[1] Whether appointed counsel would make a difference in the outcome is a question for the Seventh Circuit on review, not this court, as *Pruitt v. Mote*, 503 F.3d 647, 654 (7th Cir. 2007) has clarified.

[2] Test for Adult Basic Education.

2)  If the plaintiff wishes to appeal this dismissal, he must file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal.

Entered this 29th Day of February, 2008.

s\Harold A. Baker

HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE